**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| LESLEY SAVAGE, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>     v.<br><br>UNITED PARCEL SERVICE, INC., CAROL B. TOME, BRIAN O. NEWMAN, and NANDO CESARONE<br><br>                    Defendants | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff Lesley Savage ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by United Parcel Service, Inc. ("UPS" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of UPS' public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired UPS securities between January 30, 2024 to July 22, 2024, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.      Defendants provided investors with material information concerning UPS' expected revenue and adjusted operating margin for the fiscal year 2024. Defendants' statements included, among other things, confidence in the Company's volume growth, price discipline, cost execution, and its overall ability to handle volume variabilities.

3.      Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of UPS' growth; notably, that it was not truly equipped to handle a surge in volume in lower-profit services without seeing a significant decline in their operating margins. Such statements absent these material facts caused Plaintiff and other shareholders to purchase UPS' securities at artificially inflated prices.

4.      The truth emerged on July 23, 2024 when UPS announced its financial results for the second quarter of fiscal 2024, provided lower-than-expected guidance for the third quarter, and reduced its margin guidance for the full fiscal year 2024. The Company attributed its results and lowered guidance on the shift in "U.S. volume mix both in terms of product and customer segmentation . . . toward value products."

5.      Investors and analysts reacted immediately to UPS' revelation. The price of UPS' common stock declined dramatically. From a closing market price of $145.18 per share on July

22, 2024, UPS' stock price fell to $127.68 per share on July 23, 2024, a decline of $17.50 per share, or about 12.05% in the span of just a single day.

## JURISDICTION AND VENUE

6.     Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant UPS is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.     Plaintiff purchased UPS common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in UPS is attached hereto.

3

12.     United Parcel Service, Inc. is a Georgia corporation with its principal executive offices located at 5 Glenlake Parkway, N.E., Atlanta, GA 30328. During the Class Period, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "UPS."

13.     Defendant Carol B. Tome ("Tome") was, at all relevant times, the Chief Executive Officer and Director of UPS.

14.     Defendant Brian O. Newman ("Newman") was, at all relevant times, the Executive VP and Chief Financial Officer of UPS.

15.     Defendant Nando Cesarone ("Cesarone") was, at all relevant times, the Executive VP & President of U.S. Operations.

16.     Defendants Tome, Newman, and Cesarone are sometimes referred to herein as the "Individual Defendants." UPS together with the Individual Defendants are referred to herein as the "Defendants."

17.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of UPS' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information n available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the

4

false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

18.     UPS is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

19.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to UPS under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

20.     UPS is a multinational parcel delivery and supply chain management solutions company operating in more than 200 countries and territories.

21.     UPS provides same day and overnight air delivery, definite-date ground delivery, and SurePost, which provides non-urgent deliveries with the final leg provided by the U.S. Postal Service.

### *The Defendants Materially Misled Investors Concerning*

### *UPS' Revenue Outlook for Fiscal Year 2024*

### *January 30, 2024*

22.     On January 30, 2024, UPS issued a press release publishing their fourth quarter and full year results for fiscal year 2023.  In the same publication, the Company further announced its fiscal 2024 guidance as follows:

> For the full year 2024, UPS expects revenue to range from approximately $92.0 billion to $94.5 billion and consolidated adjusted operating margin to range from approximately 10.0% to 10.6%.

The company is planning capital expenditures of about $4.5 billion and dividend payments of around $5.4 billion, subject to board approval. The effective tax rate is expected to be around 23.5%.

23.     An earnings call was held the same day, during which CEO & Director Carol B.

Tome elaborated on the full-year guide, stating, in pertinent part:

> In 2024, the small package market in the U.S. excluding Amazon, is expected to grow by less than 1% and projected market growth rates for the rest of our business segments suggest some improvement but not until the latter part of the year. In building our 2024 financial targets, we included the low end of our guidance on market growth. And for the high end of our guidance, included growth we should experience if we capture market share. In 2024, we expect to generate consolidated revenue ranging from approximately $92 billion to $94.5 billion and a consolidated operating margin ranging from approximately 10% to 10.6%. Given the nuances of our new labor contract, there will be stark contrast between our first half and our second half performance.
>
> ***First half earnings will be compressed and second half earnings will expand. In both the low and high end of our guidance range, we expect to exit the year with a U.S. operating margin of 10%.*** Brian will provide more details in a moment. UPS remains rock-solid strong. While our dividend payout is currently higher than our targeted payout of 50% of our prior year's adjusted earnings per share, we are confident in our future. As a result, the UPS Board approved a $0.01 increase in the quarterly dividend from $1.62 per share to $1.63 per share.

(Emphasis added).

24.     Executive VP and CFO Brian O. Newman further elaborated on the bases for the

guidance, stating, in pertinent part:

> This is primarily driven by lapping the volume diversion we experienced in the U.S. last year during our labor negotiations. Additionally, costs will weigh on us in the first half of the year, primarily due to the high labor cost inflation associated with the new contract. Looking at consolidated revenue. In the first half of the year, we expect the growth rate to decline within a range of approximately 1% to 2%, with the first quarter driving the decline. And in the back half of the year, revenue growth is anticipated to be up within a range of mid- to high single digits. ***Looking at consolidated operating profit, we expect material improvement as the year progresses with the second half of the year outperforming the first half. Lastly, we expect to generate our lowest consolidated operating margin of the year in the first quarter.***

(Emphasis added).

6

25.     During the question-and-answer portion of the call, Executive VP and US President

Cesarone spoke directly to their ability to handle volume instability as follows:

> <Q: David Scott Vernon – Sanford C. Bernstein & Co., LLC – Senior Analyst> So
> I just wanted to ask on the productivity side. Obviously, hours down more than
> volume. We've had a couple of quarters of that, obviously, now the third quarter
> this year. Is there a point where volume declines become more difficult to offset?
> I'm just trying to understand the downside risk, right. If volumes continue to remain
> flat, or weaker than you expect, how should we be thinking about the downside risk
> on the margin side?
>
> . . .
>
> <A: Nando Cesarone> Yes. So David, ***for us, it is a virtuous cycle. So we're
> working ahead of any type of volume variability. So whether it goes up or down,
> we've got some of our best engineers, operations folks, finance folks identifying
> additional cost outs as we move forward, as we're executing the ones that we have
> in front of us***. So we feel good that there's a good pipeline of opportunity no matter
> what the volume does. And as Carol had mentioned, we lever our hourly headcount
> and match that to the volume and the activity. And so far, so good but still lots in
> front of us and they're pretty meaty, so we feel really good about those initiatives.

(Emphasis added).

### *March 26, 2024*

26.     On March 26, 2024, UPS conducted its annual Analyst/Investor Day presentation

where the Defendants spoke at length about their future plans and goals for the Company.  During

the call, Defendant Cesarone, while discussing the Company's roadmap for volume and margin

growth claimed the Company has "***a renewed focus on commercial opportunities by focusing on

sectors that can drive meaningful benefits to our customers … We'll use also our dynamic

pricing to attract volume while simultaneously enhancing our margins and balancing our

demand by week and by day***" (emphasis added).

27.     Furthermore, during the same presentation, Defendant Newman noted that in

"January, we provided our 2024 consolidated revenue and operating margin targets, and we are

confirming that guidance today." Detailing the prior guidance further, Newman explained, in pertinent part, that they

> still expect negative growth in total average daily volume and revenue in the first half of this year, and we expect growth to be positive in the back half of the year. We still expect first half 2024 consolidated operating profit to be down around 20% to 30% and then rebound to be up between 20% and 30% in the second half of the year.

28. The question-and-answer portion of the call followed where defendants provided more color on their growth expectations, responding to the questions, in pertinent part, as follows:

> <Q: Unknown Analyst> Great. Yes. Thanks for hosting us and for all the great information. Wanted to get -- I'll give you 2 questions. So one, just on the margin targets. How sensitive are those to volume growth? So if your domestic grows 1% sort of 3% volume, can you still hit the margin target to 12%?
>
> . . .
>
> <A: Brian O. Newman> So from a margin perspective, Tom, thanks for the question, there's a much heavier reliance on the RPP in terms of flow-through to profit. If you're thinking about margin in dollars, it's more 2/3 RPP, 1/3 volume. So there's a much heavier reliance on the pricing.
>
> . . .
>
> <Q: Amit Singh Mehrotra – Deutsche Bank AG – Director and Senior Research Analyst> Deutsche Bank. I had a question for Carol and then Brian. So you obviously have a very bullish 2026 targets. The market, at least as it speaks today doesn't seem to believe them, if I could say it that way. And so if we sit here in March of 2027 and look back. What has to go right for you guys to deliver on these bold targets? And what do you have to go wrong or would go wrong for us to kind of revising those numbers lower?
>
> And I say that in the context of really volume because volume has been a really difficult moving target for the last couple of years for a lot of reasons that are beyond your control. And so when we think about that $10 billion of domestic revenue growth, Brian, can you help us bifurcate between RPP and volume? Because RPP is fine, but the CPP at 1% also has volume leverage embedded in it. So it's really important for us to understand that $10 billion bifurcation between volume and price or RPP, what your confidence level is in that so that we're not 3 years from now coming back and saying, "Hey, we missed our targets on volume."
>
> . . .

8

<A: Brian O. Newman> And Amit, as you think about the growth in the U.S., 5% revenue growth over the next 3 years from a U.S. perspective, very balanced, 3% in the ADV, 2.5% on the RPP. As Nando and Matt have both mentioned, the type of volume we're going after is quality revenue, whether it's SMB as we drive that up from 30% going north from a mix perspective, the commercial side, very attractive. Both those things help from a mix perspective on the RPP. Our GRI has run between 4.9% and 6.9% for over a decade. So you'll have a GRI price point that will help to drive that. ***At the end of the day, it's balancing this revenue and the profit margin and there is a big flow through on the RPP piece, we remain disciplined on the revenue per piece.***

. . .

<Q: Jeffrey Asher Kauffman – Vertical Research Partners, LLC – Partner> . . . I mean, a big piece of this is RPP exceeding CPP. You go out every year with a 4.9% to 6.9% GRI. Can you help us understand how that GRI comes down to a 2.5% growth rate on the RPP? I think as David was alluding are there mix assumptions in here. I don't think it's fuel price over a 3-year period. Just kind of help us understand how that boils down to that RPP assumption?

<A: Carol B. Tome> So – who wants to take that call?

<Unknown Executive of UPS> I'll start, Dave. So Listen, the keep rate on the GRI has been running last year about 60% this year, about 50% is the expectation. So you can take that 5.9% and have a keep rate of about 5% -- 50%, excuse me to that. We have assumptions in on mix, both product and customer.

***You've had some training from air to ground going on, which applies some headwinds***. We have SMB growth, which is a bit of a tailwind. ***And then you have products like SurePost that are very attractive from a margin perspective, but lower RPP, lower CPP***. So all of that is embedded into the guide of 2.5% in the U.S. over the next 3 years, and that's how we kind of came up with the model

(Emphasis added).

<u>*April 23, 2024*</u>

29.     On April 23, 2024, UPS issued a press release wherein the Company "announced first-quarter 2024 consolidated revenues of $21.7 billion, a 5.3% decrease from the first quarter of 2023. Consolidated operating profit was $1.6 billion, down 36.5% compared to the first quarter of

2023, and down 31.5% on an adjusted basis. Diluted earnings per share were $1.30 for the quarter;

adjusted diluted earnings per share of $1.43 were 35.0% below the same period in 2023."

30.     UPS further reaffirmed its full-year fiscal 2024 guidance as follows:

- Consolidated revenue to range from approximately $92.0 billion to $94.5 billion
- Consolidated adjusted operating margin to range from approximately 10.0% to 10.6%
- Capital expenditures of approximately $4.5 billion

31.     During the same-day earnings call, CFO Newman discussed their volume growth

and its impact on their margins, stating, in pertinent part:

> Looking at the key drivers within forwarding, market rates in international airfreight continue to drive down top line revenue. ***On the ocean side, excess market capacity continued to pressure market rates and drove a decrease in revenue despite volume growth.*** And our truckload brokerage unit continued to face soft demand and market rate pressures. Logistics delivered revenue growth and increased operating profit driven by gains in health care. In the first quarter, Supply Chain Solutions generated operating profit of $226 million, down $32 million year-over-year and an operating margin of 7%. Walking through the rest of the income statement, we had $195 million of interest expense.

(Emphasis added).

32.     During the following question-and-answer portion, Defendants further elaborated

volume and margin expectations as follows:

> <Q: Eric Thomas Morgan – Barclays Bank – Analyst> This is Eric Morgan on for Brandon. I just wanted to ask about the guidance in the first half. I know you mentioned 1Q kind of coming in line with your expectations, but you did call out the 40% decline expectation at the Investor Day. ***So just wondering if anything happened late in the quarter that drove EBIT above your expectations in the first quarter? And then are there anything negative going on in 2Q that led you to maintain the first half guidance rather than raise it similar to the 1Q beat?***

> <A: Brian O. Newman> Morgan, it's Brian. Happy to take this one. ***Look, our guidance for the first half of the year remains the same, declining in profit down 20% to 30%. So that's consistent***. I did call out at the tail end of the quarter, expected minus 40%. ***I said consistently that Q1 would be the tougher quarter in the first half of the year.*** There were 2 elements that contributed to beating that 40%. One, on the top line, we did see positive volume momentum going into the

end of the quarter. In fact, the last couple of weeks were basically breakeven from a volume perspective. I think the last week was about 0% thereabout.

***So sequentially, we were seeing improved volume***. But the bigger component was just some cost trading between April and March, things like occupancy and maintenance cost shift in terms of when they hit the P&L between March and April. So no change from a guide perspective, still down 20% to 30%, some cost timing at the end of the quarter there, but the positive was the trajectory of volume momentum.

. . .

<Q: Thomas Richard Wadewitz – UBS Investment Bank – Managing Director and Senior Analyst> I wanted to see Brian or Carol, if you could walk through what are the key pieces of the 2Q versus 1Q ramp in EBIT. And then I guess the same thing for second half. Obviously, you've got Fit to Serve as a significant cost benefit 2Q versus 1Q. But I think just trying to figure out how much of the improvement sequentially is based on volume that you have visibility to and how much would be based on anticipation of improvement in the broader parcel market kind of macro improvement.

<A: Brian O. Newman> Tom, happy to take that. So listen, ***from a Q1 to Q2 perspective, the shape, if we look at the U.S., we would expect marginal growth from a volume perspective, which relative to past trends, normally, Q1 steps down to Q2 from an absolute volume level. So by maintaining that will be a natural accretion from an EBIT perspective***. The big component, though, full year on a run rate basis, the Fit to Serve program will generate $1.3 billion in savings and we're ramping that up in Q2. So that will be a big driver as well as we think about it.

And then from a Q1 to the back half of the year, it's the same 3 components, Fit to Serve. It's the volume lift along with the drivers of RPP and then it's the labor contract lapping, which is the big piece in the back end of the year.

<A: Carol B. Tomé> And maybe just a few more comments on RPP since our RPP in the U.S. was flat in the first quarter. We expect to see RPP growth as we head towards the back half of the year. Why? Well, first of all, fuel prices were a drag on the RPP in the first quarter. The projection for fuel is that is going to increase. we are also announcing a fuel surcharge later today. So those 2 components of fuel will be a bonus to RPP as we head towards the back half.

We also are going to have a pretty picky peak, we anticipate for fewer operating days this year than last, which means the demand surcharge should be pretty strong this year compared to last year. ***And then we brought in a lot of SurePost product into our network. We're meeting our customers where they want to go*** we'll be anniversary-ing a lot of that in the back half of the year as well. So we don't expect

11

-- we love SurePost by the way, but we don't expect to see the drag on the RPP I'm sure costs in the back half, like we said, in the first quarter. Any other color you'd like to provide?

<A: Brian O. Newman> I think all those that you stated, Carol, **and then the volume growth, obviously, with the comps, it's going to be a big help to us.**

. . .

<Q: Scott H. Group – Wolfe Research, LLC – MD & Senior Analyst> Brian, the second quarter guide, I guess, implies EBIT down anywhere from 10% to 30%. So any more directional color there? And then on this revenue cost allocation thing with the post office, is there any way to just quantify what the benefit is to the U.S. margin as you're doing this? And is that already sort of captured in the 10% margin comment for Q4? Or does this now take it up versus what you previously thought?

. . .

<A: Brian O. Newman> Sure. Scott, we're maintaining the first half at negative 20% to 30% from a profit perspective. So you can choose the element of the range you want to point towards. I think ADV in domestic, we're expecting Q2 to be slightly positive. **RPP should be consistent with what we saw flattish in the first quarter as we move out of the headwinds from a mix perspective** . . .

(Emphasis added).

33.     The above statements in Paragraphs 22 to 32 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risk from seasonality and macroeconomic fluctuations. In truth, UPS' optimistic reports of growth, plans to handle volume variability, upcoming profit growth, and consistent claims that the first quarter would present the worst margins of the fiscal year fell short of reality; the Company's was not truly equipped to handle a volume surge without causing a corresponding significant decline in their operating margin.

***The Truth Emerges during UPS' Second Quarter Earnings Report***

<u>*July 23, 2024*</u>

34.     On July 23, 2024, Defendants issued a premarket press release announcing results for the second quarter of fiscal 2024 well below consensus and the Company's prior guidance. In detail, UPS "announced second-quarter 2024 consolidated revenues of $21.8 billion, a 1.1% decrease from the second quarter of 2023. Consolidated operating profit was $1.9 billion, down 30.1% compared to the second quarter of 2023, and down 29.3% on an adjusted basis. Diluted earnings per share were $1.65 for the quarter; adjusted diluted earnings per share of $1.79 were 29.5% below the same period in 2023."

35.     UPS also updated its full year 2024 guide, reducing its prior projections as follows:

For 2024, UPS updates its full-year, consolidated financial targets:
- Consolidated revenue expected to be approximately $93.0 billion
- Consolidated adjusted operating margin expected to be approximately 9.4%
- Capital expenditures of approximately $4.0 billion
- Targeting around $500 million in share repurchases

36.     During the same-day earnings call, Defendants elaborated on the poor quarter and reduced guide, placing the blame on a surge of volume growth. Defendants stated, in pertinent part:

So the ***key assumptions we used to build our plan are holding with one distinction, and that's U.S. volume mix*** both in terms of product and customer segmentation. During the quarter ***we experienced a shift toward value products, with shippers choosing ground over air and SurePost over ground***. And there was also a notable shift in product characteristics with a surge in lightweight short volume moving in our network.

. . .

At the beginning of the year, we expected to see 3 things in the second quarter: volume growth, growth in B2C and relatively consistent product mix to what we had experienced last year.

While we saw strong volume growth in the second quarter led by B2C, it came with a different product mix.

. . .

From a product perspective, we saw customers trade down between services. Specifically, we saw customers shift from air to ground and from ground to SurePost. As a result, total air average daily volume was down 7.8%, while ground average daily volume increased 2.3%. Within ground, SurePost average daily volume grew 25% driven by new shippers product choices, product trade downs and easier comparisons due to last year's decline in volume during our contract negotiations. By enhancing our matching algorithm, we saw an increase in the percentage of SurePost packages redirected to UPS for delivery. As a result, SurePost Redirect increase returning to 2020 level.

. . .

Let me break down the components of the revenue per piece decline. Base rates increased the revenue per piece growth rate by 90 basis points. The combination of product mix, lighter weights and shorter zones decreased the revenue per piece growth rate by 310 basis points. The remaining point -- basis point decline in the revenue per piece growth rate was due to the combination of changes in customer mix and fuel.

(Emphasis added).

37.     During the subsequent question-and-answer portion of the call, Defendants elaborated further on their volume growth impact to margins as follows:

<Q: Thomas Richard Wadewitz – UBS Investment Bank – Managing Director and Senior Analyst> I wanted to see if you could offer some more thoughts on what's happening with domestic package volume and the mix effect. If I look at the core ground, so excluding SurePost, it looks like you saw a decline sequentially. So let's say, 12.3 million pieces a day in 1Q to 11.7 million if I exclude SurePost. So do you think -- is that just market weaker? Or is that kind of competitive performance? So just wanted to see if you could offer more thoughts on what's happening in domestic package volume. And then maybe why -- what are key levers to see that mix performance improve as we look at second half?

<A: Brian Dykes> Thanks, Tom, for the question. I think when you look at the domestic volume performance from the second quarter and then going forward, in the second quarter, there was really two big impacts that were driving the change. **One is we did see customers favoring our more economical products, so going** from air to ground, and within ground, from ground to SurePost. And that was across the broad base of customers. **We also saw an acceleration of new entrants,**

*new e-commerce customers that were coming into the market that are, quite frankly, running a different model than our traditional customers and are highly leveraging our SurePost product.* So we saw an acceleration of SurePost.

The growth rate is also complicated as you think about what happened in the second quarter of last year because of the type of customers that diverted early. As we were approaching the Teamster contract, it does also skew the growth rate. As we move forward and you see -- you can see it in our forecast and within the guide, that we do expect that mix to rationalize as we move towards the end of the year. And we've got line of sight to that in our pipeline and are working to actively pull those through as we kind of balance the mix of products going into the second half.

<A: Carol B. Tome> And maybe a couple of other comments about just the volume. *As you saw, our commercial business was down year-on-year, although the rate of decline has moderated greatly. As we look to the back half of the year, we expect that to improve*. Our pipeline is quite robust. So we expect to see good movement in that space.

. . .

<Q: Ravi Shanker – Morgan Stanley – MD & Lead Analyst> Two-parter, if I may, please. Given -- I mean, you've done a pretty good job of kind of managing your largest customer in terms of size. *Will you be looking to also meter the growth from these new e-commerce customers as part of better, not bigger if the mix is not being helpful?* And second question is, can you help us dimension the size of returns in your operation either in terms of volume or revenue, please?

<A: Carol B. Tome> So first, in terms of our largest customer, we have a very good relationship with that customer, and the revenue for the quarter was at 11.5% of total revenue, so about the same as it was a year ago. And we look forward to continuing to optimizing the relationship we had with that customer. *In terms of the new e-commerce entrants that have come into our network, we are focused on serving the segments of the opportunities that really respect our end-to-end network, and we will continue to do that*.

. . .

<Q: David Scott Vernon – Sanford C. Bernstein & Co., LLC – Senior Analyst> So Carol, when you came in, there was a lot of focus on value over volume. But here we are guiding down the back half on really easy comps through growth in lower-value volume. Has something changed to your focus for the company? Like what should investors take away from this sort of -- what seems like a pivot towards chasing volume again?

<A: Carol B. Tome> Yes. So we're not chasing volume. *We actually accepted new customers into our network of certain volume expectations that blew up on us.*

*We're not chasing it. It's just their demand was much higher than we had anticipated.* And so we are laser-focused, focusing on the segments of the market that value our end-to-end network. Better not bigger has not gone away. *We'll be managing through this. We need to manage through it and we will be managing through it.* So don't read anything into this other than we had new customers come in to our network whose volume blew up. And we were able to serve that with the best on-time service of any carrier.

. . .

<Q: David Scott Vernon – Sanford C. Bernstein & Co., LLC – Senior Analyst> So I mean, I guess, I appreciate that. But when you think about the guidance you just gave for 3Q being 10% to 15% off a really low base, it just doesn't seem like it's dropping to the bottom line. And that's what investors are looking to capitalize your earnings, not necessarily productivity or cost per piece growth.

<A: Carol B. Tome> Yes. No, we appreciate that. We do. *There are a number of actions that we can take to address this. But we thought it was important to provide guidance today.* It's that the most realistic view of the back half of the year. It doesn't mean that this is the future of our company. In fact, as we mentioned, we will exit the U.S. with a 10% operating margin. That's a significant change from where we have been.

(Emphasis added).

38.     The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the January 30, 2024, March 26, 2024, and April 23, 2024 earnings and analyst/investor day calls. On those calls, Defendants continually praised their improving volumes, plans for profit growth, use of dynamic pricing, and, generally, their ability to handle volume variability, while continually minimizing risks associated with seasonality and the potential impact of the macro environment on the Company's future profitability.

39.     Investors and analysts reacted immediately to UPS' revelation. The price of UPS' common stock declined dramatically. From a closing market price of $145.18 per share on July 22, 2024, UPS' stock price fell to $127.68 per share on July 23, 2024, a decline of $17.50 per share, or about 12.05% in the span of just a single day.

40.     A number of well-known analysts who had been following UPS lowered their price targets in response to UPS' disclosures. For example, J.P. Morgan, while reiterating their neutral rating, cautioned that "perform rating post drop summarized that the "correction in UPS following 2Q24 results and lowered 2024 guide reflects a concern that the company implemented a volume-over-price strategy which drove a significant amount of negative mix shift during the quarter when volumes from new e-commerce customers like Temu soared."  The analyst went on to note that UPS "had stabilized its exposure to Amazon at 11.5% of revenue so embracing the two emerging e-comm growth engines seems like a strategic step backwards ... The company's strategy looks like volume now and price later considering record peaking surcharges."

41.     Similarly, Barclays, while considerably reducing their price target, stated that "UPS management has been setting aspirational, yet unattainable, guidance since mid-2023 which we see as continuing into the back half of 2024 following a quite disappointing second quarter."  The analyst further highlighted that with UPS "seeking volume expansion in the fast growing but lower value fast fashion ecommerce domain with customers such as Temu and Shein, **we see management as trading price for growth with the hopeful intention to lessen unit cost impacts looking forward**" (emphasis added).

42.     The fact that these analysts, and others, discussed UPS' shortfall and below-expectation projections suggests the public placed significant weight on UPS' prior revenue and sales estimates. The frequent, in-depth discussion of UPS' guidance confirms that Defendants' statements during the Class Period were material.

### Loss Causation and Economic Loss

43.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that

artificially inflated the price of UPS' common stock and operated as a fraud or deceit on Class Period purchasers of UPS' common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of UPS' common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of UPS' common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

44.    UPS' stock price fell in response to the corrective event on July 23, 2024, as alleged *supra*. On July 23, 2024, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning UPS' forecasting processes and growth guidance.

45.    In particular, on July 23, 2024, UPS announced significantly below-market growth expectations, reducing their own prior guidance for operating margins in fiscal year 2024 from 10-10.6% down to 9.4%, a relative drop of about 8.74% in guidance.

### *Presumption of Reliance; Fraud-On-The-Market*

46.    At all relevant times, the market for UPS' common stock was an efficient market for the following reasons, among others:

(a)    UPS' common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)    UPS communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    UPS was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)    Unexpected material news about UPS was reflected in and incorporated into the Company's stock price during the Class Period.

47.    As a result of the foregoing, the market for UPS' common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in UPS' stock price. Under these circumstances, all purchasers of UPS' common stock during the Class Period suffered similar injury through their purchase of UPS' common stock at artificially inflated prices, and a presumption of reliance applies.

48.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

49.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in

19

sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

50.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

51.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of UPS who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired UPS' common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families

and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

53. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, UPS' common stock were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by UPS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of July 17, 2024, there were 856.5 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

54. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

55. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

56. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)      whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of UPS;

(c)      whether the Individual Defendants caused UPS to issue false and misleading financial statements during the Class Period;

(d)      whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)      whether the prices of UPS' common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

57.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

58.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

60.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of UPS common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire UPS' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

61.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for UPS' securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

62. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

63. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of UPS' internal affairs.

64. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to UPS' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of

UPS' common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired UPS' common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

65.     During the Class Period, UPS' common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of UPS' common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of UPS' common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of UPS' common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

66.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the

disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

68.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69.   During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about UPS' misstatements.

70.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by UPS which had become materially false or misleading.

71.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which UPS disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause UPS to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of UPS' common stock.

72.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause UPS to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

73.     By reason of the above conduct, the Individual Defendants and/or UPS are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: October 10, 2024                Respectfully submitted,

**HOLZER & HOLZER, LLC**

<u>s/ *Marshall P. Dees*</u>
Corey D. Holzer
Georgia Bar No. 364698
Marshall P. Dees
Georgia Bar No. 105776
211 Perimeter Center Parkway,
Suite 1010
Atlanta, Georgia 30346
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
cholzer@holzerlaw.com
mdees@holzerlaw.com

*Liaison Counsel for Plaintiff*

-and-

**LEVI & KORSINSKY, LLP**
Adam M. Apton (*pro hac vice* forthcoming)
33 Whitehall Street, 17th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*